

**FILED**

Apr 23 2015, 9:20 am

*[signature]*

**CLERK**

of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT

Mark J.R. Merkle
Marc T. Quigley
Libby Y. Goodknight
Kay Dee Baird
Krieg DeVault LLP
Indianapolis, Indiana

ATTORNEYS FOR AMICUS CURIAE
INDIANA BANKERS ASSOCIATION

Thomas W. Dinwiddie
Maureen E. Ward
Wooden & McLaughlin LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Henry J. Price
Joseph N. Williams
Price Waicukauski & Riley, LLC
Indianapolis, Indiana

William M. Sweetnam
Sweetnam LLC
Chicago, Illinois

# IN THE
# COURT OF APPEALS OF INDIANA

Old National Bank,

*Appellant-Defendant,*

v.

Steven Kelly, Jon A. Cook, and
Rebecca F. Cook, individually
and on behalf of others similarly
situated,

*Appellees-Plaintiffs*

April 23, 2015

Court of Appeals Case No.
82A01-1406-CT-234

Appeal from the Vanderburgh
Circuit Court
The Honorable David D. Kiely,
Judge
Cause No. 82C01-1012-CT-627

**Bailey, Judge.**

# Case Summary

Old National Bank ("the Bank") brings an interlocutory appeal challenging the trial court's denial of the Bank's motion for summary judgment upon breach of contract, conversion, and equitable claims of a certified class of depositors-plaintiffs who were charged overdraft fees stemming from debit card transactions (hereinafter, "Depositors").[1] We affirm in part and reverse in part.

# Issue

The Bank presents a single (consolidated) issue: whether it is entitled to summary judgment upon each of Depositor's claims because those claims are preempted by federal law or because the Bank, as movant for summary judgment, has negated essential elements of each of those claims.

# Facts and Procedural History

Steven Kelly, Jon A. Cook, and Rebecca F. Cook, on behalf of themselves and a class of consumer checking account holders, brought a class action suit

---

[1] The class consists of residents of the State of Indiana who were, within the applicable statute of limitation, and before August 15, 2010, charged an overdraft fee by Old National Bank for a debit card transaction made with an Old National Bank branded debit card. August 15, 2010 is the date upon which the Bank changed its practice, such that customers would no longer be automatically enrolled in the Bank's overdraft protection program.

against the Bank.[2]  The Amended Class Action Complaint ("the Complaint") challenged a bank bookkeeping device known as "high-to-low" posting,[3] the delayed debiting of transactions, and the Bank's alleged utilization of a so-called "shadow" line of credit.[4]  *See Gutierrez v. Wells Fargo Bank, N.A.*, 730 F. Supp.2d 1080 (N.D. Cal. 2010) ("*Gutierrez I*"), *aff'd. in part, rev'd. in part on other grounds* 704 F.3d 712 (9th Cir. 2012) ("*Gutierrez II*").

[4]     A copy of a Deposit Account Agreement between class members and the Bank was attached as Exhibit A.  In relevant part, it provided:

> If there are available funds to cover some, but not all, of the withdrawals or other debits (such as charges) to your Account, we may post those withdrawals or other debits for which there are sufficient available funds in any order we may choose at our sole discretion.  If there are insufficient available funds to cover some of the withdrawals or debits presented against your Account, such items will be handled in accordance with our overdraft procedures or in accordance with any other agreement you may have with us (such as an overdraft protection program).  Even if we choose to pay one or more overdrafts, we are not obligated to cover any future overdrafts.  We

---

[2] The original complaint, by Steven Kelly, was filed on November 9, 2010.  The Cooks were added as named plaintiffs on May 1, 2012.  On March 20, 2013, the trial court certified the case as a class action pursuant to Indiana Trial Rule 23.

[3] "Posting" is the procedure banks use to process debit items which have been presented for payment against accounts.  *Gutierrez v. Wells Fargo Bank, N.A.*, 704 F.3d 712, 716 (9th Cir. 2012).

[4] The *Gutierrez I* court explained the practice of allowing a "shadow" line of credit as follows:  "Wells Fargo implemented a practice involving a secret bank program called 'the shadow line.'  Before, the bank declined debit-card purchases when the account's available balance was insufficient to cover the purchase amount.  After, the bank authorized transactions into overdrafts, but did so with no warning that an overdraft was in progress.  Specifically, this was done without any notification to the customer standing at the checkout stand that the charge would be an overdraft and result in an overdraft fee.  Thus, a customer purchasing a two-dollar coffee would unwittingly incur a $30-plus overdraft fee."  730 F.Supp.2d at 1085.

may determine the balance of your account in connection with determining whether payment of an item will create an overdraft at any time between the time we receive the item and the deadline for us to take action on the item. We are not required to determine your account balance more than one (1) time during this period. An NSF/overdraft item fee may be assessed on any item that will overdraw the available account balance, regardless of whether we pay or dishonor (return) the item.

(App. 95-96.)

[5] The common factual allegations included an allegation that the Bank manipulated customers' electronic debits[5] from highest to lowest dollar amount, thereby depleting customer funds and maximizing the occurrences of $35.00 overdraft fees.[6] (App. 13.) Depositors also alleged that the Bank grouped together transactions from multiple days, defying a reasonable contractual expectation of the consumer that instantaneous electronic transactions would be posted in chronological order. According to Depositors, "customer accounts may not have been actually overdrawn at the time the overdraft fees were charged, or at the time of the debit transaction." (App. 6.) Finally, Depositors alleged that the Bank failed to provide accurate and timely information to Depositors regarding their balances or to warn that an overdraft was in progress.

---

[5] These included point-of-sale ("POS") purchases and Automated Teller Machine ("ATM") withdrawals.

[6] For example, if a customer makes ten deductions of $10, followed in time by an eleventh deduction of $101 from a $100 account, the bank would re-sequence the transaction to deduct the $101 first. This would overdraw the account, such that each of the eleven charges would incur an overdraft charge. Had the bank processed the transactions chronologically, only the eleventh transaction (for $101) would be overdrawn, and the customer would incur one fee.

[6] Count I, captioned "Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing," was premised upon the contention that the Bank, "through its overdraft policies and practices," breached the Deposit Agreement and its implied covenant of good faith and fair dealing. (App. 24.) Count II alleged that the Bank committed civil conversion by taking specific and readily identifiable funds without consent and with intent to permanently deprive Depositors of those funds. Count III alleged that the Bank was unjustly enriched when it retained funds under circumstances making it inequitable to do so.

[7] Count IV alleged that the Bank's "overdraft policies and practices were substantively and procedurally unconscionable." (App. 27.) In particular, it was alleged that the Bank automatically enrolled customers in overdraft protection service; the Bank did not obtain affirmative consent prior to processing a transaction that would result in an overdraft charge; the Bank did not provide an opportunity for transaction cancellation before fee assessment; the Deposit Agreement was a contract of adhesion; the fee schedule was not signed by the customers; and the Deposit Agreement failed to unambiguously reveal the re-ordering process. Depositors asserted that a fee in excess of the amount overdrawn "is itself unconscionable." (App. 28.)

[8] Count V alleged that the Bank had violated the Indiana Crime Victim Relief Act, Indiana Code Section 34-24-3-1, et seq. ("the Act"). In their prayer for relief, Depositors sought restitution of all overdraft fees and actual damages trebled (together with attorney's fees and costs) pursuant to the Act.

[9] On June 11, 2013, the Bank moved for summary judgment upon each of the Depositors' claims. A summary judgment hearing was conducted on September 16, 2013. The Bank did not assert the existence of an issue of material fact as to whether the Bank engaged in the conduct alleged, that is, batching and re-ordering of transactions and providing overdraft coverage without an opt-out policy. Rather, the Bank claimed entitlement to judgment as a matter of law due to preemption by federal banking law and the non-viability of state claims. Depositors conceded that re-ordering of transactions was not "per-se" unlawful, but argued that its state claims should proceed because the Bank's printed materials were misleading in that they suggested instantaneous account for instantaneous transactions. (Tr. 52, 60.)

[10] The motion for summary judgment was denied on April 14, 2014. The trial court granted the Bank's request to certify the order for interlocutory appeal. On July 11, 2014, this Court accepted jurisdiction.

# Discussion and Decision

## *Summary Judgment Standard of Review*

[11] In *Sargent v. State*, No. 49S02-1312-MI-790 (Ind. Mar. 24, 2015), our Indiana Supreme Court summarized the summary judgment standard of review:

> When reviewing a grant or denial of a motion for summary judgment our standard of review is the same as it is for the trial court. *Kroger Co. v. Plonski*, 930 N.E.2d 1, 4 (Ind. 2010). The moving party "bears the initial burden of making a prima facie showing that there are no

genuine issues of material fact and that it is entitled to judgment as a matter of law." *Gill v. Evansville Sheet Metal Works, Inc.*, 970 N.E.2d 633, 637 (Ind. 2012) (citations omitted). Summary judgment is improper if the movant fails to carry its burden, but if it succeeds, then the nonmoving party must come forward with evidence establishing the existence of a genuine issue of material fact. *Id.* In determining whether summary judgment is proper, the reviewing court considers only the evidentiary matter the parties have specifically designated to the trial court. *See* Ind. Trial R. 56(C)(H). We construe all factual inferences in the non-moving party's favor and resolve all doubts as to the existence of a material issue against the moving party. *Plonski*, 930 N.E.2d at 5.

Slip op. at 3-4.

[12]     When the defendant is the moving party, the defendant must show that the undisputed facts negate at least one element of the plaintiff's cause of action or that the defendant has a factually unchallenged affirmative defense that bars the plaintiff's claim. *First Farmers Bank & Trust Co. v. Whorley*, 891 N.E.2d 604, 608 (Ind. Ct. App. 2008). Although Indiana Trial Rule 56 employs language nearly identical to Federal Rule of Civil Procedure 56, Indiana's summary judgment procedure diverges from federal summary judgment practice. *Pearman v. Jackson*, 25 N.E.3d 772, 777 (Ind. Ct. App. 2015). While federal practice permits the moving party to merely show that the party carrying the burden of proof lacks evidence on a necessary element, we impose a more onerous burden: to affirmatively negate an opponent's claim. *Id.* Summary judgment is not a summary trial and Indiana consciously errs on the side of letting marginal cases proceed to trial on the merits. *Id.*

# Preemption

[13] The designated materials – taken in the light most favorable to Depositors, as the non-movant for summary judgment – reveal that the Bank issued to Depositors debit/ATM cards accompanied by overdraft protection. The Bank was instantly notified of debit card transactions and could immediately determine whether customers had sufficient account funds to cover transactions. The Bank could then accept or decline transactions.

[14] The Bank did not agree to honor transactions in the event of insufficient funds but had discretion to do so; however, customers were not offered an opt-out of such "courtesy" overdraft coverage. The Bank did not post electronic transactions in real-time, but rather in batches. The batched transactions, which might include transactions from more than one calendar day, were not posted in chronological order, but based on amount – from high to low. This maximized revenue for the Bank, because customers incurred additional overdraft fees that would not have been imposed had the transactions been posted either chronologically or in a "low to high" order.

[15] The Deposit Account Agreement did not specifically advise of the procedure to be employed and in some instances used language suggestive of real-time transactions. According to Depositors, they were sometimes penalized for having an overdrawn account when there were actually funds available to pay most transactions.

[16] The Bank does not directly dispute its use of procedures that maximized overdraft fees. The Bank (and amicus Indiana Bankers Association) contend

that Depositors' claims are preempted by the National Bank Act of 1864, 12 U.S.C. § 1 et seq. Depositors counter that the National Bank Act does not preempt state law claims based on contracts, torts, or criminal law, provided those laws do not significantly impair federally-authorized deposit-taking powers. Although Depositors agree that principles of preemption prevent a state court's review of the propriety of a particular posting method, they contend that they should have their day in court on state claims that derive from misrepresentations and bad faith.

[17] The Supremacy Clause of the United States Constitution states that the laws of the United States "shall be the supreme Law of the Land; … any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl 1. Courts have recognized three scenarios where federal law preempts state law: (1) express preemption (based on explicit language from Congress, (2) field preemption (based on a pervasive regulatory scheme leaving no room for state supplementation; and (3) conflict preemption (where state and federal law directly conflict). *Barnett Bank of Marion Cnty., N.A. v. Nelson*, 517 U.S. 25, 31 (1996). Conflict has been found where compliance with both federal and state law is a "physical impossibility;" or when the state law stands "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.*

[18] The Bank is a national bank federally chartered by the Office of the Comptroller of the Currency ("OCC") under the National Bank Act. OCC is the federal agency charged by Congress with supervision of the National Bank Act and has

promulgated federal banking regulations. *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 6 (2007). The National Bank Act vests in nationally chartered banks enumerated powers, such as the power to make contracts, to receive deposits, and to make loans, together with such incidental powers as shall be necessary to carry on the business of banking. *Id.* at 11. Litigants cannot bring state law claims against national banks in an effort to impact how the bank operates, "except in so far as Congress may see proper to permit." *Id.* at 11.

[19] In enacting the National Banking Act, Congress created a regime in which the Federal Government exercises general oversight while leaving state substantive law in place. *In re HSBC Bank, USA, N.A., Debit Card Overdraft Fee Litigation*, 1 F.Supp.3d 34, 44 (E.D. NY 2014). Federal regulations have no less preemptive effect than federal statutes. *Id.* Efforts to hold banks liable for practices that purportedly violate state law "are void if they conflict with federal law, frustrate the purposes of the National Bank Act, or impair the efficiency of national banks to discharge their duties." *Bank of Am. v. City & Cnty. of San Francisco*, 309 F.3d 551, 561 (9th Cir. 2002). Nonetheless, federally chartered banks are subject to state laws of general application to the extent that there is not a conflict with the letter or general purposes of the National Banking Act. *Watters*, 550 U.S. at 11. Causes of action sounding in contract, consumer protection statutes and tort have been found by federal courts not to be preempted. *In re HSBC*, 1 F.Supp.3d at 46.

[20] When a Court reviews a claim of preemption, the relevant inquiry is "whether the state law claims, as alleged, more than incidentally affect the exercise of the

banks' deposit taking power." *Id.* at 48. In *King v. Carolina First Bank*, 26 F.Supp.3d 510, 515 (2014), the Court observed: "In general, state laws on contract or torts 'are not inconsistent with the deposit-taking powers of national banks and apply to national banks to the extent consistent with the decision of the Supreme Court in *Barnett Bank of Marion County, N.A. v. Nelson, Florida Insurance Commissioner, et al.*, 517 U.S. 25 (1996).'" (quoting 12 C.F.R. § 7.4007.)

[21]  The OCC has "implicitly" permitted national banks to use high-to-low posting for checks in certain circumstances. *In re HSBC, 1 F.Supp.3d at 45.* The OCC has determined that "[t]he establishment of non-interest charges and fees, their amounts, and the method of calculating them are business decisions to be made by each bank, in its discretion, according to sound banking judgment and safe and sound banking principles." 12 C.F.R. § 7.4002(b)(2). Moreover, the OCC interpretations of its own regulations are controlling unless plainly erroneous or inconsistent with the regulation. *In re HSBC*, 1 F.Supp.3d at 46. "A national bank may exercise its deposit-taking powers without regard to state law limitations concerning," among other things, "disclosure requirements." 12 C.F.R. § 7.4007(b)(3).

[22]  The Bank claims that Depositors have only made allegations that invoke the deposit-taking powers and disclosure obligations of a bank, and are accordingly preempted. In asserting its preemption argument, the Bank relies heavily upon *Gutierrez II* (holding that the National Bank Act preempts state regulation of the

posting order of debit card transactions as well as any obligation to make specific, affirmative disclosures to bank customers).

[23] The *Gutierrez* case concerned Wells Fargo's "bookkeeping device" of posting debit transactions from high-to-low in order to maximize overdraft charges; failure to disclose this policy to consumers; and misleading statements to the effect that debit transactions would be posted chronologically. *See Gutierrez I*, 730 F.Supp.2d at 1082. The district court found that the National Banking Act did not preempt unfair competition law claims and enjoined the practice. The district court also ordered restitution. The Ninth Circuit reversed in part and affirmed in part, considering "the extent to which overdraft fees imposed by a national bank are subject to state regulation." *Gutierrez II*, 704 F.3d at 716. The Ninth Circuit held that 12 C.F.R. § 7.4002(b) preempted the challenge to Wells Fargo's posting order. With reference to OCC letters interpreting that provision, the Court reasoned that "federal law authorizes national banks to establish a posting order as part and parcel of setting fees, which is a pricing decision." *Id*. at 724. The district court could not disregard the OCC's determination of what constitutes a legitimate pricing decision. *Id.* at 725. However, the allegation regarding misleading statements was not preempted; California's prohibition on misleading statements did not significantly interfere with the bank's ability to offer checking account services, choose a posting method, or calculate fees. *See id.* at 727.

[24] As the Bank points out, the language of the Complaint focused at length upon the utilization of high-to-low posting. Depositors strenuously argued that the

Bank should have employed procedures more in line with consumer expectations, and also claimed that they were given insufficient disclosures. To the extent that the right to employ a particular posting practice and the content of Bank disclosures are challenged, these are within the preemption categories recognized in *Gutierrez II*. *See Gutierrez II*, (wherein the Ninth Circuit Court succinctly stated that state law cannot "dictate" a bank's "choice of posting method.") 704 F.3d at 723. However, Depositors do not seek an outright prohibition of high-to-low posting. They claim, in essence, that the Bank combined measures of delayed debiting, batching, and posting such that the Bank abused its contractual discretion and violated a duty of good faith and fair dealing. According to Depositors, the Bank triggered overdrafts where funds were actually available for payment.

[25] Where an attack has been made not upon the right to charge overdraft fees but upon an allegedly unlawful manipulation of the overdraft program to maximize fees, it has been held that the allegations "do no more than incidentally affect the banks' exercise of their deposit taking power and are therefore not preempted." *In re Checking Account Overdraft Litig.*, 694 F.Supp.2d 1302, 1313 (S.D. Fla. 2010). *See also King*, 26 F.Supp.3d at 515 (declining to find preemption as a matter of law where plaintiffs were attempting to recover for past conduct inconsistent with contractual obligations as well as assessment of improper overdraft fees assessed when accounts were not overdrawn). Here, upon examination of the broad allegations made by Depositors, and mindful of our summary judgment standard, we cannot conclude as a matter of law that

the state laws implicated by the Complaint stand as "an obstacle to the accomplishment and execution of the purposes and objectives of Congress." *Barnett Bank*, 517 U.S. at 31. The Bank has not shown an irreconcilable conflict or that the state laws do more than incidentally affect the bank's deposit-taking power. The Bank is not entitled to a declaration of preemption in these summary judgment proceedings.

[26] Because the Bank has additionally argued that it has negated each of the state law claims and is, on that basis, entitled to summary judgment, we turn to an examination of the viability of those claims.

## State Law Claims

[27] *Breach of Contract.* The relationship between a depositor and a bank is contractual in nature. *Wells v. Stone City Bank*, 691 N.E.2d 1246, 1249 (Ind. Ct. App. 1998), *trans. denied.* "[T]he essential elements of any breach of contract claim are the existence of a contract, the defendant's breach thereof, and damages." *Holloway v. Bob Evans Farms, Inc.*, 695 N.E.2d 991, 995 (Ind. Ct. App. 1998). According to the Bank, it has negated an element of Depositors' claim, that is, it performed all its duties in accordance with the contractual provisions. Moreover, the Bank insists that Indiana courts simply do not recognize an implied covenant of good faith and fair dealing in bank contracts with depositors. Depositors have not alleged a breach of a specific contract term. Their claim with respect to performance of the contract is that the Bank

did not carry out its discretionary procedures as contemplated by the implied covenant of good faith and fair dealing.

[28] Indiana law does not impose a generalized duty of good faith and fair dealing on every contract; the recognition of an implied covenant is generally limited to employment contracts and insurance contracts. *Allison v. Union Hosp., Inc.*, 883 N.E.2d 113, 123 (Ind. Ct. App. 2008). *See Wells*, 691 N.E.2d at 1251 (declining "to hold that the relationship between a bank and a checking account holder is *always necessarily* a fiduciary one") (emphasis added). Nonetheless, there is no absolute restriction to employment and insurance contracts. *See id.* (stating "we do believe the relationship invokes a duty of good faith and fair dealing to at least the same extent as does a buyer-seller relationship" as "a bank is inherently in a position superior to its checking account holders"). We discern no crucial difference between insurance companies and banks, as each – from a superior vantage point – offer customers contracts of adhesion, often with terms not readily discernable to a layperson.

[29] "If the contract is ambiguous or expressly imposes such a duty on the parties, then the courts will impose such a duty [of good faith and fair dealing]." *Id.* (citing *First Fed. Sav. Bank of Ind. v. Key Mkts., Inc.*, 559 N.E.2d 600, 604 (Ind. 1990)). As explained by our Indiana Supreme Court in *First Federal Savings Bank of Indiana*:

> It may well be that in limited and particular cases the court may be required to presume the parties were acting reasonably and in good faith to discern the intention of the parties and resolve the ambiguity or uncertainty. In other words, courts are bound to recognize and

enforce contracts where the terms and the intentions of the parties can be readily determined from the language in the instrument. It is not the province of courts to require a party acting pursuant to such a contract to be 'reasonable,' 'fair,' or show good faith cooperation. Such an assessment would go beyond the bounds of judicial duty and responsibility. . . . It is only where the intentions of the parties cannot be readily ascertained because of ambiguity or inconsistency in the terms of a contract or in relation to extrinsic evidence that a court may have to presume the parties were acting reasonably and in good faith in entering into the contract.

559 N.E.2d at 604.

[30] In accordance with this guidance, in order to show that Depositors' breach of contract claim could not survive, the Bank would be obliged to show that its contract is not ambiguous and is not inconsistent in its terms *or in relation to extrinsic evidence*. *See id.* We cannot, by examination of the contract and with reference to undisputed facts, conclude that the Deposit Agreement unambiguously and consistently provides for the sums actually charged by the Bank. Summary judgment is inappropriate where, as here, a factfinder could infer from the designated materials that the Bank breached its duty of good faith and fair dealing.

[31] *Conversion*. Depositors alleged that the Bank converted their funds and sought recovery pursuant to Indiana Code Section 34-24-3-1, which permits victims of certain crimes, including theft and conversion, to bring a civil action for treble damages and attorney's fees. To show that the Bank committed the crime of conversion, Depositors would need to establish that the Bank knowingly or intentionally exerted unauthorized control over Depositors' property. Ind. Code § 35-43-4-3; *Breining v. Harkness*, 872 N.E.2d 155, 159 (Ind. Ct. App. 2007)

*trans. denied*. In a criminal conversion action, criminal intent is an essential element to be proven. *Schrenker v. State*, 919 N.E.2d 1188, 1193 (Ind. Ct. App. 2010). Such intent is established when a plaintiff shows the defendant was aware of a high probability his control over the plaintiff's property was unauthorized. *Id.* at 1194.

[32] Here, the parties entered into a contractual relationship. The designated materials disclose that funds deposited into customer funds were commingled; from the amount credited to an individual depositor, electronic debits and withdrawals could be made. "A general deposit vests the property in the bank or trust company for all purposes, but a special deposit is limited for specific purposes." *Sindlinger v. Dep't of Fin. Insts. of Ind.*, 210 Ind. 83, 199 N.E. 715, 725 (Ind. 1936). The character as a general deposit is presumed. *See id.* Accordingly, "well-grounded" Indiana law provides that money deposited in a general account becomes the property of the bank and the depositor becomes the bank's creditor to the extent of the deposit. *First Bank of Whiting v. Samocki Bros. Trucking Co.*, 509 N.E.2d 187, 198 (Ind. Ct. App. 1987). As a general principle, a bank owes sums deposited in its accounts "as with any ordinary debt." *Id.*

[33] "[T]he failure to pay a debt does not constitute criminal conversion as a matter of law." *Tobin v. Ruman*, 819 N.E.2d 78, 89 (Ind. Ct. App. 2004). The Bank is entitled to summary judgment upon the civil and criminal conversion claims.

*Unconscionability.* A contention that a contract is unconscionable is something typically raised as a defense. A litigant might also seek a declaratory judgment of unenforceability because a contract or certain provisions were unconscionable. *Weaver v. American Oil Co.*, 257 Ind. 458, 276 N.E.2d 144 (1971). Here, however, Depositors did not expressly seek a declaratory judgment. They sought damages. We are aware of no substantive cause of action in Indiana to recover monetary damages for drafting or enforcing an unconscionable contract term. The Bank is entitled to summary judgment upon a free-standing claim of unconscionability.

*Unjust Enrichment.* Here, the parties' relationship as depositors and depositary was governed by a contract, the existence of which is not disputed by either party. "The existence of express terms in a valid contract precludes the substitution of and the implication in law of terms regarding the subject matter covered by the express terms of the contract." *Keystone Carbon Co. v. Black*, 599 N.E.2d 213, 216 (Ind. Ct. App. 1992), *trans. denied*. The equitable remedy of unjust enrichment is not available to Depositors. Again, the Bank is entitled to summary judgment upon this claim.

# Conclusion

C.F.R. § 7.4002 authorizes a bank to charge overdraft fees, but does not authorize banks to ignore state contract or tort law. Depositors have alleged that the Bank acted inconsistent with its contractual obligations and assessed improper overdraft fees. The Bank has not negated Depositors' state law claim

for a breach of a duty of good faith and fair dealing. However, Depositors' claims for conversion, unconscionability,[7] and unjust enrichment have been negated. We remand for further proceedings consistent with this opinion.

[37] Affirmed in part; reversed in part; and remanded.

Robb, J., and Brown, J., concur.

---

[7] Summary judgment is appropriate to the extent that Depositors seek damages, as opposed to declaratory relief, for allegedly unconscionable contract terms.