**FILED**

Jun 20 2017, 9:07 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT

Robert J. Palmer
May Oberfell Lorber
Mishawaka, Indiana

ATTORNEYS FOR APPELLEE

M. Patricia Hackett
Peter A. Timler
Hackett & Associates, P.C
South Bend, Indiana

Shawn P. Ryan
South Bend, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Cynthia Clark-Silberman, <br><br>*Appellant-Respondent,* <br><br> v. <br><br> Richard M. Silberman and Susan A. Wang, <br><br> *Appellees-Petitioners.* | June 20, 2017 <br><br> Court of Appeals Case No. 71A05-1607-TR-1740 <br><br> Appeal from the St. Joseph Probate Court <br><br> The Honorable James N. Fox, Judge <br><br> Trial Court Cause No. 71J01-1306-TR-5[1] |

**Kirsch, Judge.**

---

[1] We note that, in order to "address[] all matters regarding the Estate of Harold A. Silberman[,]" the trial court previously consolidated the will contest, trial court cause number 71J01-1308-ES-180, with the above cause number 71J01-1306-TR-5, which stemmed from litigation over decedent's revocable trust. *Appellant's App.* Vol. 2 at 28.

After Harold A. Silberman ("Harold") died in 2013, litigation ensued between his wife, Cynthia Clark-Silberman ("Cynthia"), and his two adult children from a former marriage, Richard A. Silberman ("Richard") and Susan A. Wang ("Susan"), concerning Harold's estate and his revocable trust agreement. As is relevant here, Richard and Susan filed a Petition to Set Aside Trust Amendments and Petition for Damages. After a seven-day combined trial on the trust litigation and the pending will contest, the trial court issued findings and conclusions, ruling against Cynthia in all respects. Cynthia appeals only the trial court's determination that she converted funds that were in a safe deposit box, raising two issues that we consolidate and restate as: whether the trial court erred when it determined that Cynthia's act of removing $46,182 in cash from the safe deposit box constituted conversion and that Richard and Susan were entitled to an award of treble damages.

We affirm.

## Facts and Procedural History[2]

Harold and Cynthia married on February 23, 1991. Each had been married before, and each had children from the prior marriage. About two years after they married, Cynthia moved out of their residence and to Indianapolis, and she filed for dissolution, although they later reconciled. Sometime prior to moving out, Cynthia had found Harold's estate papers on his desk and noticed

---

[2] We commend the trial court on its detailed findings and conclusions, which aided our appellate review.

that, in the event of his death, his plan was to give his one-half of the marital residence to his children, which made Cynthia feel "hurt" that he was not giving it to her. *Tr.* Vol. 3 at 171-172.

[4] Harold died on May 5, 2013. Prior to his death, Harold had been suffering from chronic obstructive pulmonary disease ("COPD"), due to a lifetime of smoking, and other significant health problems including heart disease. Harold also suffered from depression and chronic anxiety disorder. While at home on or about January 24, 2013, Harold fell and was admitted to the intensive care unit of Memorial Hospital in South Bend for end-stage COPD. Harold spent much of the remainder of his life in the hospital or at a rehabilitation center.

[5] During his life, Harold was a driven and successful business man, who could be demanding and difficult. One business venture was a ticket brokering business, involving the purchase and re-sale of sporting event tickets ("the Ticket Business") generally and, in particular, Notre Dame football tickets.[3] Harold also had a number of investment funds and accounts. Harold generally consulted with long-time friend and business partner, Geoffrey Newman ("Geoff"), and with childhood friend, Irv Rosenberg ("Irv"), on business matters. Irv was also Harold's attorney.

---

[3] The parties dispute whether it was called Harold's Tickets (and was solely owned by him) or whether it was called Harold and Cindy's Tickets (and they both owned it).

[6] Irv prepared estate planning documents for Harold. Among other things, Irv prepared a Financial Springing Power of Attorney, dated November 15, 1995, which named Cynthia, Richard, and Susan as co-financial attorneys-in-fact and named Geoff as the final arbiter of disagreements between Harold's fiduciaries. *Appellees' App*. Vol. 2 at 67. Irv later prepared the Harold A. Silberman Revocable Trust ("Trust"), which Harold executed on October 8, 2002. The Trust named Cynthia, Richard, and Susan as co-trustees. Irv also prepared Harold's Last Will and Testament ("Will"), which Harold executed on July 21, 2009. Cynthia, Richard, and Susan were named co-personal representatives. In the Will, Harold gifted to Richard and Susan a Philippe Patek gold watch that Harold had received from his father. Irv also prepared a First Amendment to Trust ("First Amendment"), dated October 8, 2002, and executed on July 21, 2009. Under the First Amendment, Cynthia, Richard, and Susan remained co-trustees, but Cynthia's share in the estate was increased from $300,000 to a one-third share of the estate, with Richard and Susan also each getting a one-third share.[4] On July 21, 2009, Harold also executed a Health Care Power of Attorney, which named Cynthia, Richard, and Susan as co-health care personal representatives.

[7] On December 29, 2012, Irv prepared an Asset Purchase, Independent Contractor, and Non-Compete Agreement ("Purchase Agreement"), in which

---

[4] Irv also prepared at Harold's request a Second Amendment to the Trust, which Harold executed on April 18, 2013, which changed Cynthia's interest from one third to fifty percent. The trial court found that Cynthia unduly influenced Harold to execute it. However, this Second Amendment is not at issue in this appeal.

the Ticket Business was sold to a third party. The Purchase Agreement identified Harold and Cynthia as "Sellers" of the business. *Appellant's App*. Vol. 3 at 21. The agreed purchase price was $125,000, payable in one installment of $62,500 and two later installments of $31,250. In the event that Harold died before all payments were made, any remaining installment payments would be paid to Cynthia at a fifty percent reduction since the goodwill of the business was personal to Harold. The first installment, received in December 2012, was deposited in Harold's trust account and then transferred in January 2013 to a joint account held by Harold and Cynthia. After Harold died, Cynthia received the two remaining installment payments of $15,625 each on May 15, 2013 and September 15, 2013.

[8] Cynthia testified that, in December 2012 or early January 2013, Harold told her that his estate planning documents were located in a filing cabinet in the basement, and he told her she could look at them. She obtained and reviewed the estate planning documents and was unhappy about only receiving a one-third share of Harold's estate, stating that it made her feel "sick to her stomach" and "crushed." *Tr*. Vol. 3 at 112-113. She felt that he should have "explained this stuff to me" before then and that Harold's plan to give her one-third and each of his children one-third was treating her like a child. *Id*. at 113. She also was concerned about serving as a co-trustee or co-personal representative with Richard. Sometime after Harold was hospitalized, Cynthia spoke to her friend Pat LeMaire ("Pat") about her concerns, and Pat offered to have her husband, Denis Glick ("Denis") review the documents; Denis had been an attorney in

California, but was disbarred in 1992. Pat and Denis did not speak to Harold, but they prepared: (1) an "Amendment" to the Trust ("Third Amendment") which changed the successor co-trustees from Cynthia, Richard and Susan to just Cynthia as the sole successor trustee; and (2) an "Amendment" to Harold's Will ("Codicil"), providing that the proceeds of the Ticket Business were to go to Cynthia. *Appellee's App*. Vol. 2 at 138, 140.

[9] Harold fell and was hospitalized near the end of January 2013. On February 6, Cynthia went to PNC Bank ("PNC"), where Harold had a safe deposit box, titled in the names of Harold, Richard, and Susan. Richard and Susan each had keys to the box. PNC was not willing to allow Cynthia access to the box without a power of attorney. At Cynthia's request, Pat and Denis prepared a financial power of attorney ("Financial POA"), naming Cynthia as the sole attorney-in-fact; Cynthia took the Financial POA to Harold in the hospital on February 6, and he signed it. Cynthia returned to PNC on February 7, where she presented the Financial POA. After Denis spoke to a manager, PNC allowed Cynthia to open the box, from which she removed cash in the amount of $46,182 and the Philippe Patek gold watch.[5] Although Richard and Susan were at that time either in town or arriving in town to see their father, Cynthia did not tell them that she was going to or did open the safe deposit box.

[5] Petitioner's Exhibit 49 is Harold's handwritten entries showing cash deposits and withdrawals from the safe deposit box. The last notation for a deposit was on December 31, 2012 showing a deposit of $33,622 "from ND football for 2012." *Appellant's App*. Vol. 3 at 5; *Tr*. Vol. 3 at 195. The last entry in the notations was $46,182, which is the amount that the trial court found Cynthia had removed.

Cynthia returned one or more times to PNC and removed gold coins and an engraved pen set. Cynthia testified that she used some of the money to pay living expenses and she put the remainder in her Key Bank safe deposit box.

[10] On February 10 or 11, 2013, Harold was transferred from the hospital by ambulance to a rehabilitation facility called Healthwin Specialized Care ("Healthwin"). On February 11, Cynthia brought the Third Amendment and the Codicil, documents which had been prepared by Pat and Denis, to Harold at Healthwin, and he signed them.

[11] In June 2013, Cynthia filed a petition to docket Harold's Revocable Trust Agreement and amendments thereto. In August 2013, Richard and Susan filed, among other things, a Petition to Set Aside Trust Amendments and Petition for Damages ("the Petition"). The Petition alleged: Count I, undue influence, duress, fraud, and/or coercion; Count II, insufficient capacity; Count III, breach of trust through improper removal, commingling and/or conversion of trust assets; and Count IV, breach of fiduciary duties as Harold's attorney-in-fact; and Count V, failure to administer the Trust according to its terms.

[12] In October and November 2014, the trial court held seven days of trial on pending motions and matters, including the Petition. Irv testified that Harold never mentioned, and Irv was never told about, the February 2013 Financial POA or Codicil that Cynthia had Pat and Denis prepare, by purchasing a form from the internet and adding Harold and Cynthia's names, and that Cynthia presented to Harold in the hospital. Irv testified that he recalled discussing

Harold's 1995 Financial Springing Power of Attorney with Harold in December 2012, in the presence of Cynthia, during their discussions related to the sale of the Ticket Business. Geoff testified that in a December 2012 lunch meeting, Harold discussed with Geoff that his estate plan was one-third to Cynthia and one-third each to Richard and Susan; Geoff stated that Harold after that date never indicated to Geoff an intent or desire to change that plan. About one week before his fall and hospitalization at the end of January 2013, Harold sent an email to Cynthia, Richard, and Susan giving them information that the three of them would need, as co-trustees and co-personal representatives, about his financial holdings and persons to contact. Based on conversations that Irv had with Harold in the year or two prior to his death, including as late as April 18, 2013, Irv's understanding was that Harold intended to have three successor co-trustees upon his passing.

[13] Evidence presented at trial indicates that, during their marriage, Harold for the most part did not share his finances or estate plan with Cynthia. She testified that when she would ask to see his estate plan, he generally would respond by telling her that he would tell her "after football is over." *Tr.* Vol. 3 at 111. His unwillingness to share his estate plan with Cynthia frustrated her, as she felt she had a right to know, and this continued to be "on her mind" during their twenty-plus years of marriage. *Id.* at 184.

[14] Cynthia testified that Harold gave her his key to the safe deposit box and told her to go to PNC and remove the cash, watch, pen set, and coins; however, bank personnel did not allow her to access it without a power of attorney. The

next day, she returned to PNC with the Financial POA that Harold had signed the previous day, and presented it in order to gain access to the safe deposit box jointly titled to Harold, Richard, and Susan. Cynthia removed $46,182 in cash, which she placed in her own Key Bank safe deposit box, along with Harold's father's Philippe Patek gold watch, which Harold had gifted to Richard and Susan in his Will. On February 9, 2013, Cynthia returned to PNC twice, and, took up to eighty gold coins and an engraved pen set. Richard and Susan were in South Bend to see their father in the hospital at the time Cynthia gained access to the box, and Cynthia never told them that she was doing so. Cynthia acknowledged that she knew the safe deposit box was titled to Richard, Susan, and Harold.

[15] At trial, petitioners Susan and Richard called Dr. Paul W. Macellari ("Dr. Macellari"), a clinical neuropsychologist, to testify to, among other things, how illnesses impact cognitive functioning. Dr. Macellari reviewed all of Harold's medical records, with focus on the stage and severity of his COPD and related lung infections, resulting in drops of oxygen levels and episodes of respiratory failure. Dr. Macellari testified that he had never treated a patient with Harold's severity of illness who was not cognitively impaired nor who would not be susceptible to influence or manipulation if actions were taken to increase the patient's anxiety. Cynthia presented the trial deposition of Dr. Motasem Afyouni ("Dr. Afyouni"), who was Harold's treating physician. Dr. Afyouni's deposition testimony included his opinion that patients with end-stage COPD often develop anxiety stemming from the sense of "doom" that they feel

because they are unable to breathe, as if "you fell in the water, you can't swim and you're under the water." *Afyouni Depo.* at 83.

[16] The trial court took the matter under advisement, and the parties submitted proposed findings and conclusions. On March 25, 2015, the trial court issued an Order. The trial court's findings included the following:

> 34. PNC Bank advised Cynthia Clark Silberman that she could not open the safe deposit box without a power of attorney.
>
> 35. Denis Glick, Pat LeMaire prepared a Durable Power of Attorney[.]
>
> 36. Cynthia Clark Silberman opened the safe deposit box that belonged to Harold Silberman, Richard Silberman, and Susan Wang.
>
> 37. Cynthia Clark Silberman removed items from the safe deposit box on several different occasions.
>
> 38. Cynthia Clark Silberman removed an envelope that contained cash, a fungible item.
>
> . . . .
>
> 40. Despite not counting the cash, Cynthia Clark Silberman acknowledged that the cash was put into her Key Bank safe deposit box and that the amount of the cash was $46,182.00. []

*Appellant's App.* Vol. 2 at 23-24.

[17] The trial court's conclusions of law included that (1) Cynthia by means of undue influence, induced Harold to execute Trust amendments on February 11, 2013 and April 18, 2013; (2) Harold did not have sufficient capacity to execute the February 11 and April 18 amendments to the Trust; and (3) Cynthia, a Trustee, failed to administer the Trust according to its terms. As to Count III of the petition, alleging that Cynthia converted trust property, at issue in this appeal, the trial court concluded:

> [T]he duty of personal representatives and trustees is to act according to the trust. The [Financial POA] also requires this fiduciary duty of [] Cynthia Clark Silberman. Cynthia Clark Silberman has repeatedly acted in violation of the duties imposed by Indiana Code, Indiana Law[,] and the estate planning documents of Harold A. Silberman. Cynthia Clark Silberman had taken beneficial title to trust properties. She has violated the letter and directions of the document that she now points to as providing her that very power.

*Id.* at 33. The trial court continued and explained:

> Cynthia Clark Silberman did not contact Richard Silberman or Susan Wan[g] before going to PNC bank with Denis Glick and removing items from the safe deposit box. Cynthia Clark Silberman indicated that she was instructed to do this by Harold A. Silberman. However, Cynthia Clark Silberman did not use the springing power of attorney in existence at the time. Cynthia Clark Silberman did not wait for Richard Silberman or Susan Wan[g] to arrive in town. Cynthia Clark Silberman removed items and later returned to retrieve items that she claimed that she asked if she could have. This seems to be squarely at odds with the [Financial POA] prepared by Denis Glick and Pat LeMaire and executed by Harold A. Silberman on February 6,

2013. Assuming arguendo (and the Court does NOT do so) that the [Financial POA] was properly prepared and executed this very document prohibits the actions of Cynthia Clark Silberman.

The Court now finds that the Petitioners have proven Count III by a preponderance of the evidence. Cynthia Clark Silberman Committed Breach of Trust for Conversion of Beneficial Interests and Title to Trust Property by removing items from the safe deposit box and exerting control over them without permission. The Court notes that even if the Petitioners agreed that the document signed on February 6, 2013 was properly executed (the Court notes that the Petitioners do not concede this point) the February [6], 2013 document explicitly prohibits this activity as well as all other testamentary changes. You would essentially end up at the same conclusion because of this document.

*Id*. at 34. The trial court concluded that, as alleged in Count IV of the Petition, Cynthia committed a breach of fiduciary duties as an attorney-in-fact, and she breached this duty "whether the February 6, 2013 [Financial POA] document was properly executed or not." *Id*. As to damages, the trial court determined, in part:

The [Financial POA] signed on February 6, 2013 does not give specific instruction to open any safe deposit box, unless it is for the benefit of Harold A. Silberman. This document also prohibits the Attorney in Fact from benefitting, receiving compensation, or changing documents without specific grant of authority and court approval.

The Court finds that Cynthia Clark Silberman converted the property of Richard Silberman and Susan Wang.

*Id*. at 35. The court awarded damages in the amount of $138,546, representing treble the amount that Cynthia removed from the safe deposit box. Cynthia now appeals.

## Discussion and Decision

[18] Cynthia appeals the trial court's determination that, when she removed the cash from the safe deposit box, she converted trust property and that Richard and Susan were entitled to an award of treble damages. Where, as here, the trial court entered findings of fact and conclusions of law at a party's request, our standard of review is well-settled:

> We may not set aside the findings or judgment unless they are clearly erroneous. In our review, we first consider whether the evidence supports the factual findings. Second, we consider whether the findings support the judgment. Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference. A judgment is clearly erroneous if it relies on an incorrect legal standard. We give due regard to the trial court's ability to assess the credibility of the witnesses. While we defer substantially to findings of fact. We do not defer to conclusions of law. We do not reweigh the evidence; rather we consider the evidence most favorable to the judgment with all reasonable inferences drawn in favor of the judgment.

*State v. IBM*, 51 N.E.3d 150, 158 (Ind. 2016) (internal quotations and citations omitted). Cynthia claims that the trial court's ruling that she converted the cash is clearly erroneous.

[19] A person who knowingly or intentionally exerts unauthorized control over property of another person commits criminal conversion. Ind. Code § 35-43-4-3. A person engages in conduct 'intentionally' if, when he engages in the conduct, it is his conscious objective to do so." Ind. Code § 35-41-2-2(a). "A person engages in conduct 'knowingly' if, when he engages in the conduct, he is aware of a high probability that he is doing so." Ind. Code § 35-41-2-2(b). Indiana Code Section 35-43-4-1(a) provides that to "exert control over property" means to obtain, take, carry, drive, lead away, conceal, abandon, sell, convey, encumber, or possess property, or to secure, transfer, or extend a right to property. A person's control over property of another person is "unauthorized" if it is exerted without the other person's consent, in a manner or to an extent other than that to which the other person has consented, or by promising performance that the person knows will not be performed. *See* Ind. Code § 35-43-4-1-(b)(1), -(2), and -(6).

[20] Pursuant to Indiana Code section 34-24-3-1, a person who has suffered a pecuniary loss as a result of a criminal conversion may bring a civil action to recover the loss. *JET Credit Union v. Loudermilk*, 879 N.E.2d 594, 597 (Ind. Ct. App. 2008), *trans. denied*. If the person who suffered the pecuniary loss proves the elements of criminal conversion by a preponderance of the evidence, he or she can recover up to three times the actual damages, the costs of the action, and reasonable attorney's fees. *Id.* A criminal conviction of conversion is not a condition precedent to recovery in the civil action. *Id.*; *Huff v. Biomet, Inc.,* 654

N.E.2d 830, 835 (Ind. Ct. App. 1995), *abrogated on other grounds by St. Vincent Hosp. & Health Care Ctr., Inc. v. Steele,* 766 N.E.2d 699 (Ind. 2002).

[21] Money may be the subject of an action for conversion, so long as it is capable of being identified as a special chattel. *Huff*, 654 N.E.2d at 836; *see also Bowden v. Agnew*, 2 N.E.3d 743, 750-51 (Ind. Ct. App. 2014) (wrongful failure to distribute net revenue from joint venture was not criminal conversion). This requires that the money "must be a determinate sum with which the defendant was entrusted to apply to a certain purpose." *Huff*, 654 N.E.2d at 836 (quoting *Trietsch v. Circle Design Grp., Inc.,* 868 N.E.2d 812, 821-22 (Ind. Ct. App. 2007)).

[22] Applying that principle, our courts have made it clear that "the refusal to pay a debt will generally not support a conversion action." *Old Nat'l Bank v. Kelly,* 31 N.E.3d 522, 532 (Ind. Ct. App. 2015), *trans. denied*. For instance, a law firm's refusal to pay a lawyer his share of retained earnings has been found to be a mere failure to pay a debt and not actionable as a conversion. *Tobin v. Ruman,* 819 N.E.2d 78, 89 (Ind. Ct. App. 2005) (failure of employer to pay employee retained earnings was failure to pay debt), *trans. denied*. Similarly, a real estate broker's refusal to return deposits paid toward a purchase of property that later fell through has been found not to support a claim of criminal conversion under Indiana law, because the purchasers did not have "a possessory interest in the specific funds" and the circumstances "merely amounted to a refusal to pay a debt." *Huff,* 654 N.E.2d at 836 (discussing *Kopis v. Savage,* 498 N.E.2d 1266, 1269-70 (Ind. Ct. App. 1986) and *Stevens v. Butler,* 639 N.E.2d 662, 666 (Ind. Ct. App. 1994), *trans. denied*). Indiana courts also do not allow claims for

conversion in the context of contract disputes. *See Jet*, 879 N.E.2d at 597 (criminal conversion statute was not intended to cover situations of breach of contract disputes or failure to pay debt). For instance, in *French-Tex Cleaners v. Cafaro Company*, 893 N.E.2d at 1156 (Ind. Ct. App. 2008), a tenant claimed that a landlord overbilled them for real estate taxes for more than a decade, and the tenant pursued a claim of conversion. On appeal, this court determined that the tenant's claim concerning overbilling was based on a question of contract interpretation and did not constitute a claim for conversion. *Id*. at 1167.

[23] The present case, however, is neither a contract dispute nor a claim for repayment of a debt. Nor was the $46,182 put into some other pool of money where it was co-mingled. Rather, we find that it is more akin to a situation where determinate sums were placed with a third party for safekeeping, or held in a separate fund or account, which are circumstances that we have held may support a claim for criminal conversion. In *Kopis v. Savage*, Kopis received a $40,000 deposit from Savage toward the purchase price of certain property. Kopis comingled the deposit with other unrelated accounts and refused to refund the money to Savage when "the deal soured." 498 N.E.2d at 1269. Kopis argued on appeal that his actions were a refusal to pay a debt and did not support an action for conversion, and this court agreed, finding that Savage "surrendered all possessory and ownership rights in the $40,000 when his bank paid the money to Kopis[,]" and thus no longer had a property interest in the specific funds. *Id*. at 1270. In reaching that decision, we observed,

> The parties did not agree to set up an escrow account or to *deliver the money to any third party for safekeeping.* We can find nothing *in the conduct of the parties* or in the wording of the receipt *which indicates the parties intended for Savage to retain any ownership or possessory rights* in the $40,000.
>
> . . . .
>
> We might reach a different result if the parties had reached an agreement that the check was not to be negotiated[.]

*Id.* (emphasis added). In contrast, here, Harold delivered the $46,182 to PNC and placed it in an envelope in a safe deposit box. The safe deposit box was titled in his name together with his children's names. We believe this is the type of "deliver[ing] to a third party for safekeeping" and conduct that "indicates intention to retain ownership" that *Kopis* found was lacking in that case.

[24] An action allowing conversion of money was found to exist in *Midland-Guardian Co. v. United Consumers Club, Inc.,* 499 N.E.2d 792 (Ind. Ct. App. 1986), *on reh'g* 502 N.E.2d 1354 (Ind. Ct. App. 1987), *trans. denied.* In *Midland,* the parties were engaged in an ongoing business relationship in which Midland, the defendant, purchased installment contracts from United Consumers Club ("UCC"), the plaintiff. 502 N.E.2d at 1355. Midland paid an agreed amount for the contracts less a set and certain percentage of the purchase price retained in a "holdback reserve account" that belonged to UCC, subject only to Midland's right to charge back uncollectible contracts according to a pre-

arranged formula. *Id.* The *Midland* court determined that when Midland refused to transfer the funds to UCC after termination of the parties' business relationship, Midland knowingly exercised unauthorized control over UCC's property, thereby committing criminal conversion. *Id.* In arriving at its decision, the *Midland* court distinguished the facts before it from those present in *Kopis,* noting that the specific holdback reserve funds were, in effect, "entrusted to Midland to be separately held and accounted for." *Id.* The holdback reserve agreements did not create an obligation to repay a debt, instead they placed Midland in a position of responsibility to return the remainder of these separately identified accounts at the appropriate time." *Id.*

[25] We find that, in a similar way, the $46,182 were funds, in a determinate amount, that were placed in a separate and identified location for safekeeping, to be accessed by Harold or the other owners of the safe deposit box, or returned to Harold's estate at the appropriate time. The trial court did not err in concluding that Cynthia converted the $46,182.[6] *See In re Clayton,* 778 N.E.2d 404, 405 (Ind. 2002) (held to be conversion where attorney spent settlement proceeds earmarked for client); *Roake v. Christensen,* 528 N.E.2d 789, 791 (Ind.

---

[6] We note that Finding of Fact No. 38 states: "Cynthia Clark Silberman removed an envelope that contained cash, a fungible item." *Appellants' App.* Vol. 2 at 23. Cynthia argues on appeal that, because the trial court characterized cash as fungible, "the money cannot be capable of being identified as a special chattel." *Appellant's Br.* at 14. We disagree and find that the trial court's use of "fungible" does not preclude a finding of conversion in this case, given that the cash was in a determinate sum, entrusted by Harold for safekeeping in a safe deposit box titled in his name along with his children's names. Under these circumstances, we find that the cash was capable of being identified as a special chattel and was subject to conversion.

Ct. App. 1988) (held to be conversion where employer failed to remit group health insurance premium payments withheld from employee paychecks).

[26] Cynthia argues that Indiana requires that the money must have been entrusted to the defendant for a specific purpose, and that, here, there is no evidence that the money was entrusted to her, or anyone, for a specific purpose, and thus she cannot be said to have converted it. We disagree, not with the legal premise, but with her analysis and outcome. The record before us is that Harold's course of conduct indicates that he intended to retain ownership and possessory interest in that specific $46,182 and that he entrusted the money to PNC, to be separately held and accounted for, accessible only by a valid power of attorney and, if removed, to be retained by that person (here, Cynthia) in accordance with the document's terms and for Harold's benefit. Only through falsely representing to PNC that she was Harold's sole attorney-in-fact, did Cynthia successfully access and remove the funds and place them in her Key Bank safe deposit box. Furthermore, there is no evidence that, after she took the funds, she told Harold, Richard, or Susan that she had done so. Thus, even if Cynthia's access to the box was gained through a valid power of attorney (and neither we nor the trial court find that the Financial POA was valid), her actions after taking the money do not reflect that she was acting for Harold's benefit.

[27] Cynthia also asserts that the $46,182 consisted of profits from the operation of the Ticket Business and that the Purchase Agreement named her as a "Seller" of the Ticket Business; therefore, she claims, the money was hers to take from

the safe deposit box, *i.e.*, she was authorized to take it. We reject her claim. First, the trial court did not find that she was a part-owner of the Ticket Business.[7] On appeal, Richard and Susan maintain that their father ran the business many years, the goodwill was solely his and that the entire ticket brokering business was based on his relationships with ticketholders who were willing to sell their tickets, the business was called Harold's Tickets, and Cynthia helped Harold with it, but was not an owner. Second, assuming without deciding that she was a part-owner, this would not entitle her to remove the money which was in a box titled, not in just Harold's name, but rather in the names of Harold, Richard, and Susan.

[28] We find that under the circumstances of this case, the $46,182 was capable of being identified as a special chattel, as necessary to support a claim for conversion, and that Cynthia converted the funds. Pursuant to Indiana Code 34-24-3-1, it was not error for the court to issue an award of treble damages.

[29] Affirmed.

[30] Mathias, J., and Altice, J., concur.

---

[7] Although the trial court in Finding of Fact No. 53 referred to "Harold's ticket business" when discussing the Codicil and its effect on distribution of the estate, including proceeds from the business, the trial court did not make any specific findings with regard to ownership of the business. *Appellant's App*. Vol. 2 at 24.