

FILED

Apr 24 2025, 8:57 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

IN THE

# Court of Appeals of Indiana

Keith D. Harper,

*Appellant-Defendant*

v.

S&H Leasing, LLC; K&K Real Estate Holdings, LLC; Thomas Hagen; Brian Brisco; and Jeremy Noetzel,

*Appellees-Plaintiffs*

April 24, 2025

Court of Appeals Case No.
24A-PL-1606

Appeal from the Elkhart Superior Court

The Honorable Stephen R. Bowers, Judge

Trial Court Cause No.
20D02-2108-PL-200

**Opinion by Judge Bailey**

Judge DeBoer concurs.
Judge Vaidik concurs in part and concurs in result with separate opinion.

**Bailey, Judge.**

## Case Summary

[1] Keith Harper and Kathryn Summers each owned fifty percent of the membership interest units[1] in two limited liability companies: S&H Leasing, LLC ("S&H") and K&K Real Estate Holdings, LLC ("K&K") (collectively, "the LLCs"). In 2015, Harper and Summers gifted five of S&H's membership units to Thomas Hagen and three to Brian Brisco. Thereafter, Hagen and Brisco negotiated to purchase additional membership units in both LLCs. S&H's controller informed Hagen and Brisco that they needed to return their initial units, and they were each paid for their share, but they had to sign their checks back to Harper as a down payment for their planned purchase of the additional units. Ownership of the two LLCs' membership units changed from Harper and Summers to Harper, Hagen, and Brisco. Ultimately, Jeremy Noetzel also purchased membership units.

[2] In January 2017, Harper directed the transfer of $275,000 from K&K's bank account to his personal line of credit. After Noetzel discovered the transaction

---

[1] The parties and the trial court used the terms "interest units" and "shares" interchangeably.

in 2022, Hagen, Brisco, Noetzel, and the LLCs (collectively, "the Plaintiffs") filed an amended complaint and, in relevant part, claimed that they were entitled to relief under the Crime Victims Relief Act ("CVRA"), that Harper had violated his fiduciary duty when he used the funds for personal use, and that Harper had been unjustly enriched when he did not credit Hagen's and Brisco's down payments toward the purchase of their membership units.[2] Following a trial, the court found in favor of the Plaintiffs on those counts. Harper now appeals. We affirm in part, reverse in part, and remand with instructions.

## Issues

[3] Harper raises the following three issues for our review:

1. Whether the court erred when it ruled in favor of the Plaintiffs on their CVRA claim.

2. Whether the court erred when it concluded that he had breached his fiduciary duty to Hagen, Brisco, S&H, and K&K.

3. Whether the court erred when it found in favor of Hagen and Brisco on their unjust-enrichment claim.

---

[2] The Plaintiffs' amended complaint included ten counts against Harper. As Harper appeals only the trial court's judgment in favor of the Plaintiffs' claim under the CVRA and their claims for breach of fiduciary duty and unjust enrichment, we limit our discussion to the facts related to those counts. The Plaintiffs also named Summers as a defendant, but she was subsequently dismissed as a party.

## Facts and Procedural History

[4] Harper and Summers organized two limited liability companies: K&K in 2008 and S&H in 2009. S&H is in the business of buying and selling vehicles, and K&K is an affiliated real estate holding company. Each LLC has one hundred membership units, and Harper and Summers each owned fifty. Brisco started working for S&H in 2014, and Hagen became an employee of S&H in 2015. Also in 2015, Harper and Summers met Noetzel, a certified public accountant. Thereafter, Noetzel helped Harper and Summers with their tax returns and the tax returns for the LLCs.

[5] In December 2015, Harper and Summers gave Hagen five membership units in S&H, and they gave Brisco three membership units. In late 2016, Hagen and Brisco met with Harper about the possibility of purchasing additional membership units in both LLCs. In December, S&H's controller told Hagen and Brisco that they needed to return the membership unit certificates they had received in 2015. S&H then paid both Brisco and Hagen $6,000 per share, although Brisco and Hagen were required to sign their checks back over to Harper and Summers as a down payment to be used toward their purchase of the additional units. On January 1, 2017, Hagen and Brisco executed a purchase agreement and purchased additional membership units. The purchase agreement discussed a purchase price and other terms, but it did not discuss a down payment, and the down payment was never applied to the purchase price. Following that purchase, Harper owned 34%, Hagen owned 33%, and Brisco owned 33% of both LLCs. Summers no longer owned any units.

[6]     Also on January 1, 2017, Harper, Hagen, and Brisco amended the operating agreements for the LLCs. Pursuant to the amended agreements, Harper was the sole manager of both LLCs. The amended agreements provided that Harper

> shall have full and complete power and authority to make all decisions and to take all actions incident to the management and conduct of the Company's business and affairs except that a Manager may not, without the consent or approval of the Members, do any of the following:
>
>> (a) take any action in contravention of this Agreement or the [Indiana Business Flexibility] Act;
>>
>> (b) take any action resulting in personal liability of any Member in any jurisdiction; or
>>
>> (c) take any action or make any decision reserved to the Members in this Agreement or in the Articles.

Appellant's App. Vol. 2 at 146.[3]

[7]     Harper's involvement with the companies started to decrease, and he "wasn't there very much." Tr. Vol. 2 at 107. As a result, in 2019, Harper, Hagen, and Brisco agreed to make Hagen a co-manager of S&H. In the spring of 2020, Noetzel began working for S&H. In August, Noetzel purchased membership

---

[3] The amended operating agreements for S&H and K&K contain nearly identical language. For ease of reference, we will cite to the operating agreement for S&H.

units from Harper. Following that transaction, Hagen and Brisco each owned 33% of the membership units, Harper owned 24%, and Noetzel owned 10%.

[8] The relationship between Harper and the other three became "fractured," and Harper became more absent from the company. *Id*. at 135. In June 2021, the four members met to discuss amending the operating agreements and specifically to remove Harper as a manager and to give all members equal rights. Harper left the meeting early, and the remaining three individuals voted in favor of the amendments. A few days later, the remaining members terminated Harper's employment.

[9] In March 2022, Noetzel examined the LLCs' records and discovered that, in January 2017, Harper had borrowed $275,000 from RBS Properties, LLC, which he secured with real estate owned by K&K. Noetzel was also able to determine that Harper had used the funds, which totaled $273,787 after the transaction fee, to pay down his "personal line of credit" and to pay off a personal debt. Tr. Vol. 3 at 103. Hagen and Brisco were unaware of this transaction, and Harper did not include the transaction on the balance sheets.

[10] On May 24, 2022, the Plaintiffs filed an amended complaint against Harper. In relevant part, the Plaintiffs alleged that they were entitled to relief under the CVRA based on Harper's misuse of the $275,000, that Harper had breached his fiduciary duty when he used the $275,000 in company funds for personal use, and that Harper had been unjustly enriched when he did not apply Brisco's and

Hagen's down payments toward the purchase of their additional membership units.

[11] The trial court held a trial on June 13 and 14, 2023. During the trial, both parties submitted evidence and testimony in support of their claims. On July 14, one month after the trial, Harper submitted his "Final Argument" to the trial court. Appellant's App. Vol. 4 at 67. In that submission, Harper asserted for the first time that the Plaintiffs' claim under the CVRA was barred by a two-year statute of limitations because the Plaintiffs had not brought their claim "until five and [one-]half years after the questioned transaction occurred." *Id.* at 78.

[12] On June 6, 2024, the trial court issued its findings of fact and conclusions thereon. In pertinent part, the court found as follows:

> 33. In December 2016, [S&H's controller] told Hagen and Brisco that they needed to give back the share certificates and trophies they received in 2015. They were then each paid $6,000 per share for their interests, although they were required to sign their checks back over to Harper and Summers as down[ ]payment of their planned purchase of one-third interests in the companies. These down[ ]payments were not credited against the purchase price of the shares. When Noetzel pointed this out to Harper, Harper assured him he would "take care of it." It does not appear that Harper ever gave credit for the "down[ ]payment" shares as promised.
>
> * * *
>
> 43. Hagen and Brisco also learned that, through a series of transactions beginning in January 2017, Harper knowingly directed the transfer of $273,787 from K&K's bank account to his

personal line of credit or otherwise for his personal benefit. Harper did not discuss this with Hagen or Brisco despite the fact that they were each one-third members of K&K at the time. Harper did not sign a promissory note or make other arrangements to account for these transfers as a loan, let alone take any steps to repay the money, nor did Harper arrange for K&K to transfer proportionate amounts to the other members so that the transfers might be viewed as a distribution of profit to the members.

44. Harper claims that the $273,787 . . . was used to restructure debt and clear the books when Summers was bought out of the companies. But the evidence introduced at trial did not support Harper's allegation. . . .

* * *

47. Harper knew that the $273,787 was being used to pay off personal debts, including substantial gambling debts that caused his personal line of credit at PNC to be either maxed out or nearly so throughout 2016.

48. Harper has never repaid the $273,787 taken from S&H and K&K. . . .

Appellant's App. Vol. 2 at 26-30.

[13] The court then entered its conclusions. As it relates to the Plaintiffs' claim for breach of fiduciary duty, the court concluded:

In the present case, there was not a meaningful disclosure to Hag[e]n and Brisco. The transactions were not properly reflected on the balance sheet, and there is no evidence that requisite formalities were observed. Moreover, Harper then directed that

the funds ($273,787, after paying transaction fees) be used for his personal benefit, including paying down his personal line of credit at PNC Bank and extinguishing his personal debt to S&H.

* * *

Ultimately, whether Harper actually used his personal line of credit to pay for[ ] gambling, the purchase of a house, or for some other personal obligations does not matter. The key fact is that Harper used company assets to pay his personal obligations, without informing the other members of the LLCs and without obtaining proper authorization. Harper has not repaid the LLCs . . . .

The actions described above constitute breaches of the fiduciary duties Harper owed to Hagen, Brisco, S&H, and K&K, and those Plaintiffs are entitled to reasonable compensation from Harper as a result.

*Id.* at 54-56.

[14] And as to Harper's argument that the Plaintiffs' claim under the CVRA was barred by a statute of limitations, the court concluded:

The evidence at trial from Jeremy Noetzel was that he discovered the $273,787 transaction . . . following Harper's late-March 2022 deposition. Multiple parties testified that the companies' financial records were closely held by Harper at the time of these transactions and that Hag[e]n and Brisco did not have access to this information and no reason to assume that a theft (as they characterize it)[ ] had occurred until after Harper's deposition. Noetzel testified that he "had to dig deep" in the records surrounding the January 2017 RBS transaction and pieced together information from multiple sources in order to determine

what had happened. Because Harper first raised this issue in his post-trial argument, the Court finds that the limitations argument has been waived. Had the argument been raised before trial, it would have been []possible for the Plaintiffs to conduct discovery and raise arguments addressing the discovery rule. []

*Id*. at 60. In a footnote, the court "conservatively characterize[d] Harper's action as a Criminal Conversion," but noted that, "whether this was a Conversion or a Theft is immaterial." *Id*. at n.24.

[15] The court then found in favor of the Plaintiffs on their claim under the CVRA as well as their claims for breach of fiduciary duty and unjust enrichment and entered a judgment against Harper for $821,361.00, which represented "treble damages for the conversion of $273,787," as well as costs and attorney's fees. *Id*. at 62. The court also ordered Harper to pay Hagen $32,424 and Brisco $19,455 for the "remaining value" of the membership interests "taken from [them] in December 2016." *Id*. While the court did not explicitly say, it is apparent that the judgments in favor of Hagen and Brisco were based on their claims for unjust enrichment. This appeal ensued.

## Discussion and Decision

### Standard of Review

[16] Harper challenges the trial court's judgment against him on three of the counts in the Plaintiffs' amended complaint. As this Court has previously stated:

> When matters are adjudicated at a trial by the court without a jury, Trial Rule 52 governs the trial court's use of findings and

conclusions. Trial Rule 52 provides that a trial court "shall find the facts specially and state its conclusions thereon" either *sua sponte* or upon "the written request of any party filed with the court prior to the admission of evidence." T.R. 52(A) . . . .

Upon appellate review, a judgment under Trial Rule 52 may be reversed only when clearly erroneous, that is, "when the judgment is unsupported by the findings of fact and conclusions entered on the findings." *Nelson v. Marchand*, 691 N.E.2d 1264, 1267 (Ind. Ct. App. 1998). Findings are clearly erroneous when there is no evidence or reasonable inference from the evidence to support the findings, and we review only the evidence and reasonable inferences therefrom that are favorable to the judgment without reweighing evidence or reassessing the credibility of witnesses. *Id*.

*Argonaut Ins. Co. v. Jones*, 953 N.E.2d 608, 614 (Ind. Ct. App. 2011) (emphasis removed). "We evaluate conclusions of law *de novo* and owe no deference to a trial court's determination of such questions." *Briles v. Wausau Ins. Cos.*, 858 N.E.2d 208, 212 (Ind. Ct. App. 2006). Further, Harper does not challenge the court's findings of fact. As such, we must accept the facts as correct. *See Madlem v. Arko*, 592 N.E.2d 686, 687 (Ind. 1992).

## Issue One: CVRA

[17] Harper first asserts that the court erred when it found in favor of the Plaintiffs on their claim under the CVRA. The CVRA provides, in relevant part, that if a person suffers a pecuniary loss as a result of a violation of Indiana Code Article 35-43, the person may bring a civil action against the person who caused the loss for an "amount not to exceed three (3) times . . . the actual damages of the

person suffering the loss" as well as the costs of the action, reasonable attorney's fees, and all other reasonable costs of collection. Ind. Code § 34-24-3-1. To support its judgment in favor of the Plaintiffs on their claim under the CVRA, the trial court found that Harper had committed conversion, which is defined as "knowingly or intentionally exert[ing] unauthorized control over property of another person[.]" I.C. § 35- 43-4-3(a).

**Statute of Limitations**

[18] We first address Harper's assertion that the court erred when it concluded that he had waived his defense under the statute of limitations for failing to raise it in a timely manner. It is well settled that, "because the substance of a claim under [the CVRA] is punitive rather than compensatory, such claims are subject to a two-year statute of limitations." *Prime Mortg. USA, Inc. v. Nichols*, 885 N.E.2d 628, 638 (Ind. Ct. App. 2008). Further, actions under the CVRA are subject to the discovery rule, "under which a cause of action accrues, and the statute of limitations begins to run, when the plaintiff knew or, in the exercise of ordinary diligence, could have discovered that an injury had been sustained as a result of the tortious act of another." *Id*. at 639-40.

[19] Here, there is no dispute that Harper did not raise this defense until he filed his final argument on July 14, 2023, one month after the court had conducted the trial and almost one year after the Plaintiffs had filed their amended complaint in which they raised their claim under the CVRA. The trial court found that Harper had waived his defense when he raised it in a "post-trial argument"

because it was "impossible for the Plaintiffs to conduct discovery and raise arguments addressing the discovery rule." Appellant's App. Vol. 2 at 60.

[20] To support his assertion that he did not waive his defense, Harper relies on our Court's opinion in *Mizen v. State ex rel. Zoeller*, 72 N.E.3d 458 (Ind. Ct. App. 2017), *trans. denied*. In that case, Mizen, who was the chief financial officer for Center Township in Marion County, wrote a check from the Township's bank account to an account held by Mizen. Mizen wrote and deposited the check in 2010 and then used the funds for personal reasons. In 2014, the State Board of Accounts discovered Mizen's misappropriation of funds, and, in 2015, the State filed a complaint against Mizen under the CVRA. In January 2016, Mizen filed a motion for summary judgment and asserted that the State had failed to file its complaint within the two-year statute of limitations. Following a summary-judgment hearing, the trial court found that Mizen had waived his defense "by failing to include it as an affirmative defense in his pleadings." *Id*. at 464.

[21] On appeal, this Court held that, while courts "have generally held that the failure to raise an affirmative defense in pleading results in waiver of the issue," there "is also case law that indicates that the failure to plead statute of limitations as an affirmative defense does not automatically result in waiver." *Id*. at 466. Rather, this Court stated that there is a presumption that "issues can be raised as they, in good faith, are developed," which presumption can be rebutted if the party against whom it is raised makes "an affirmative showing of prejudice." *Id*. at 467 (quotation marks omitted). To make that showing, a party must show that it "will be deprived of, or otherwise seriously hindered in the

pursuit of some legal right if injection of the new issue is permitted." *Id.* (quotation marks omitted). The Court then held that, despite Mizen's "delay" in filing his motion, there was no prejudice "because the State had ample time to prepare an argument and respond to Mizen's statute of limitations defense." *Id.*

[22] Here, Harper argues that there was no prejudice to the Plaintiffs because his defense relied "solely on the evidence presented at trial[.]" Appellant's Br. at 41. Be that as it may, the fact remains that, unlike in *Mizen,* where he filed his statute of limitations defense in a summary-judgment motion prior to a hearing, Harper did not file his defense until after the court had conducted the trial. As a result, the Plaintiffs did not have a meaningful chance to conduct discovery or put forth any evidence on the issue. In other words, had the Plaintiffs known earlier that the question of the statute of limitations was at issue, they would have had the opportunity to present additional evidence and testimony to address whether Harper's actions had tolled the statute. By waiting until after the trial was over, the Plaintiffs were prejudiced by his delay. We therefore affirm the court's conclusion that he had waived his defense.

## Conversion/Theft

[23] Harper next contends that the court erred when it found in favor of the Plaintiffs on their claim under the CVRA because his transfer of the funds did not amount to conversion as a matter of law. Specifically, Harper contends that he did not commit conversion because "a defendant who received a sum of money from a plaintiff and does not return it is not liable for conversion when

the funds are not segregated for a particular purpose with the intent that the plaintiff retain ownership." Appellant's Br. at 39. As such, he maintains that the court's judgment against him for treble damages, costs, and attorney's fees under the CVRA was erroneous. We are obligated to agree.

[24] This Court has recently stated that

> money may be the subject of a conversion action only if it is a determinate sum with which the defendant was entrusted to apply to a certain purpose. A determinate sum entrusted to apply to a certain purpose is known as a "special chattel." And money may be the subject of an action for conversion *only* if it is capable of being identified as a special chattel.

*CT102 LLC v. Automotive Fin. Corp.*, 175 N.E.3d 869, 874 (Ind. Ct. App. 2021). Further, our Court has held that money cannot be the basis for a conversion claim where it is comingled with the recipient's money and where there is no evidence that the recipient was obligated to return "*the specific*" funds received. *Kopis v. Savage*, 498 N.E.2d 1266, 1270 (Ind. Ct. App. 1986) (emphasis in original).

[25] Here, while the findings show that Harper directed the transfer of funds from the LLCs for his personal use, the findings also demonstrate that Harper comingled the $273,000 with his own funds. Indeed, the court found that "Harper knowingly directed the transfer of $273,787 from K&K's bank account to his personal line of credit or otherwise for his personal benefit." Appellant's App. Vol. 2 at 29. And the court found that Harper "knew that the $273,787 was being used to pay off personal debts, including substantial gambling

debts[.]" *Id*. at 30. As such, the funds ceased to be separately identifiable chattel, and the LLCs ceased to have a property interest in that specific $273,000. In addition, there is nothing in the record to demonstrate that the funds were entrusted to Harper for a specific purpose.

[26] The trial court's findings of fact do not support a conclusion that the money was special chattel and, as a result, the money cannot support a claim for criminal conversion. We must therefore hold that the court's judgment that Harper had committed conversion was clearly erroneous.

[27] However, in their initial complaint, the Plaintiffs alleged that Harper had committed theft, which can also serve as a basis for an award under the CVRA.[4] And, it is well settled that a "reviewing court may affirm the judgment on any legal theory supported by the findings." *Smith v. Washington*, 734 N.E.2d 548, 550 (Ind. 2000). Here, Harper's actions in exerting unauthorized control over unsegregated funds constitute theft, a crime actionable under the CVRA.[5]

[28] A person commits theft when he "knowingly or intentionally exerts unauthorized control over property of another person, with intent to deprive the

---

[4] The CVRA provides that a person can bring a civil claim if they suffer a loss as a result of a violation of Indiana Code Article 35-43. I.C. § 34-24-3-1. And the theft statute can be found at Indiana Code Section 35-43-4-2.

[5] The separate opinion states that, if we find that Harper did not commit conversion, we are unable to find that he committed theft because conversion is a lesser-included offense to theft. However, when exercising unauthorized control over nonsegregated money of another, it is theft. If the funds are segregated, and can be identified as such, it is special chattel and can support a claim for conversion. In the case of money, absent the identification of the funds as special chattel, there is no lesser included offense because conversion requires the element of special chattel that is not required for theft offenses.

other person of any part of its value or use[.]" I.C. § 35-43-4-2(a). Here, the court's findings demonstrate that Harper directed the transfer of funds from the LLCs for his personal use. Indeed, the court found that "Harper knowingly directed the transfer of $273,787 from K&K's bank account to his personal line of credit or otherwise for his personal benefit." Appellant's App. Vol. 2 at 29. Further, the court found that Harper "knew that the $273,787 was being used to pay off personal debts, including substantial gambling debts[.]" *Id*. at 30. And the court's findings demonstrate that Harper took those actions without the knowledge of the other members of the LLCs, that Harper did not make any notation in the LLCs' books to indicate that he was taking the money, and that Harper had never taken any steps to pay the company back. Simply put, Harper committed theft when he took money from the LLCs with no intention of returning it.

[29] A person commits theft when he "knowingly or intentionally exerts unauthorized control over property of another person, with intent to deprive the other person of any part of its value or use[.]" I.C. § 35-43-4-2(a). Here, the court's findings demonstrate that Harper directed the transfer of funds from the LLCs for his personal use. Indeed, the court found that "Harper knowingly directed the transfer of $273,787 from K&K's bank account to his personal line of credit or otherwise for his personal benefit." Appellant's App. Vol. 2 at 29. Further, the court found that Harper "knew that the $273,787 was being used to pay off personal debts, including substantial gambling debts[.]" *Id*. at 30. And the court's findings demonstrate that Harper took those actions without the

knowledge of the other members of the LLCs, that Harper did not make any notation in the LLCs' books to indicate that he was taking the money, and that Harper had never taken any steps to pay the company back. Simply put, Harper committed theft when he took money from the LLCs with no intention of returning it.

**Unauthorized Withdrawal**

Still, Harper contends that a claim for theft must fail because the court's findings "fail to establish that [his] January 2017 withdrawal from K&K's account was unauthorized." *Id*. at 35. In particular, Harper asserts that the 2017 operating agreements "granted K&K's manager the authority 'to make all decisions and to take all actions incident to the management and Conduct of the Company's business affairs'" and that "Harper was K&K's only manager." *Id*. at 36. Harper also contends that his testimony "was the only evidence addressing the reason behind the transfer" and that his testimony demonstrated that "he withdrew the funds from K&K to pay off personal debts held in both his and Summers' names as part of the process of effectuating the transfer of interests to Hagen and Brisco." *Id*. at 36-37. Thus, he maintains that the transfer of funds "was a business decision within the scope of [his] authority as manager." *Id*. at 37.

Harper is correct that the operating agreements allowed him, as the sole manager in 2017, to "have full and complete power and authority to make all decisions and to take all actions incident to the management and conduct of the Company's business and affairs[.]" Appellant's App. Vol. 3 at 189. We

acknowledge that he testified that he had used the funds to restructure a debt related to the business, but the court specifically found that "the evidence introduced at trial did not support Harper's allegation." Appellant's App. Vol. 2 at 29. Rather, as outlined above, the court found, and Harper does not dispute, that Harper "knowingly directed the transfer of $273,787 from K&K's bank account to his personal line of credit or otherwise for his personal benefit" without discussing it with Hagen or Brisco and without making any "arrangements to account for these transfers as a loan[.]" *Id*.

[32] While the court did not make an explicit conclusion regarding Harper's authority to take such action under the operating agreements in effect at the time, it is clear that the court determined that Harper's act of transferring a substantial amount of money from the LLCs for his personal use did not qualify as an action or decision "incident to the management and conduct of the Company's business" and that his actions were not authorized by the operating agreements. Appellant's App. Vol. 3 at 189. The findings support that conclusion. We therefore affirm the court's determination that Harper's transfer of the funds was unauthorized.

[33] In sum, there is no doubt from the record that Harper knowingly or intentionally exerted unauthorized control of the LLCs' money with the intent to deprive the LLCs of any part of the money. Even the court "conservatively characterize[d] Harper's actions as Criminal Conversion" before noting that "whether this was a Conversion or a Theft is immaterial." Appellant's App. Vol. 2 at 60 n.24. The findings support a conclusion that Harper committed

theft, and that conclusion supports the court's judgment in favor of the Plaintiffs for their claim under the CVRA.

## Appellate Attorney's Fees

[34] Because the Plaintiffs prevail on their claim under the CVRA, they are entitled to appellate attorney's fees. *See Heartland Res., Inc. v. Bedel*, 903 N.E.2d 1004, 1008 (Ind. Ct. App. 2009) (stating that plaintiffs are "entitled to attorney's fees, including appellant attorney's fees, when [they] prevail[] under" the CVRA.). We therefore remand to the trial court with instructions to determine Plaintiffs' reasonable appellate attorney's fees and to include that amount in Plaintiffs' award.

## Issue Two: Breach of Fiduciary Duty

[35] Harper next asserts that the court erred when it found tha t he had breached his fiduciary duty when he transferred the $275,000.[6] As this Court has stated:

> A claim for breach of fiduciary duty requires proof of three elements: (1) the existence of a fiduciary relationship; (2) a breach of the duty owed by the fiduciary to the beneficiary; and (3) harm to the beneficiary. The standard imposed by a fiduciary duty is the same whether it arises from the capacity of a director, officer, or shareholder in a close corporation. The fiduciary must deal fairly, honestly, and openly with his corporation and fellow

---

[6] The trial court did not enter a separate monetary judgment against Harper on this count.

stockholders. He must not be distracted from the performance of his official duties by personal interests.

*West v. J. Greg Allen Builder, Inc.*, 92 N.E.3d 634, 643 (Ind. Ct. App. 2017), (quotation marks and citations omitted), *trans. denied*.

[36] Harper's only argument on this issue is that "both LLCs' operating agreements in effect in January [20]17 authorized Harper to make the withdrawal[.]" Appellant's Br. at 43. And he maintains that the trial court "founded its entire conclusion that Harper breached his fiduciary duty on this single erroneous conclusion resting on its interpretation of the 2017 Operating Agreements." *Id.* at 43-44. Stated differently, Harper again asserts that the operating agreements allowed him to transfer the money with abandon and that the court erred when it concluded differently. However, as discussed above, the court's conclusion that Harper was not authorized to transfer the funds to his personal account was not erroneous. As such, we affirm the court's judgment in favor of the Plaintiffs on their claim for breach of fiduciary duty.

**Issue Three: Unjust Enrichment**

[37] Finally, Harper contends that the court erred when it found for the Plaintiffs on their claim for unjust enrichment. As our Supreme Court has stated:

> A claim for unjust enrichment "is a legal fiction invented by the common law courts in order to permit a recovery . . . where the circumstances are such that under the law of natural and immutable justice there should be a recovery . . ." *Bayh v. Sonnenburg*, 573 N.E.2d 398, 408 (Ind. 1991) (citation omitted). "A person who has been unjustly enriched at the expense of

another is required to make restitution to the other." Restatement of Restitution § 1 (1937). To prevail on a claim of unjust enrichment, a claimant must establish that a measurable benefit has been conferred on the defendant under such circumstances that the defendant's retention of the benefit without payment would be unjust. *Bayh*, 573 N.E.2d at 408.

*Zoeller v. E. Chi. Second Century, Inc.*, 904 N.E.2d 213, 220 (Ind. 2009).

[38] Harper contends that Hagen and Brisco cannot recover under a theory of unjust enrichment because the "transfer of those units [in 2017] was accomplished by the Purchase Agreement and no other transaction" and because "that written agreement sets forth the complete terms regarding the conveyance of those eight units as part of a larger conveyance[.]" Appellant's Br. at 46. Again, we must agree.

[39] It is well settled that the "existence of express terms in a valid contract precludes the substitution of and the implication in law of terms regarding the subject matter covered by the express terms of the contract." *Zoeller*, 904 N.E.2d at 221. Further, when "the rights of parties are controlled by an express contract, recovery cannot be based on a theory implied in law." *Id.*[7]

---

[7] While not addressed by either party, we note that Indiana has recognized one exception to this general rule and stated that, "when an express contract does not fully address a subject, a court of equity may impose a remedy to further the ends of justice." *Coppolillo v. Cort*, 947 N.E.2d 994, 998 (Ind. Ct. App. 2011). Here, there is no indication that the 2017 purchase agreement did not fully address the subject of payment, and Hagen and Brisco specifically "do not challenge the fairness of the 2017 Purchase Agreement." Appellees' Br. at 30.

[40] Here, the purchase of the additional membership units was governed by a written contract. That contract fully outlines the payment terms. *See* Appellant's App. Vol. 2 at 223-24. As such, there is a valid contract with express terms covering the payment details. Hagen and Brisco cannot recover on their theory of unjust enrichment.

[41] We acknowledge that Hagen and Brisco appear to have had a prior oral agreement with Harper pursuant to which Harper was supposed to credit the checks Hagen and Brisco signed over to Harper as a down payment toward the purchase price of their additional units. But that clause was absent from the 2017 purchase agreement. Under Indiana law, it is well settled that a "court cannot relieve a party from the terms of a contract because of his failure to read all or part of it, as he is bound to know the contents of the contract which he signs." *Pinnacle Comput. Servs., Inc. v. Ameritech Publ'g, Inc.*, 642 N.E.2d 1011, 1017 (Ind. Ct. App. 1994). Hagen and Brisco could have read the contract prior to signing it and insisted that their down payment be included as a term of the contract. Failing to do so, there is no reprieve from the terms of the contract they signed.

[42] Still, Hagen and Brisco contend that the 2016 buyback of their initial shares was "not part of the 2017 transaction." Appellees' Br. at 30. In essence, they seem to assert that, because the buyback of their initial shares was completed prior to the execution of the 2017 purchase agreement, the 2017 purchase agreement does not control the rights of the parties as they relate to the 2016 buyback. But contrary to their assertions, the court's findings demonstrate that the two

transactions were intertwined such that one cannot be separated from the other. Indeed, the court found that Hagen and Brisco "were required to sign their checks back over to Harper . . . as down[ ]payment of their planned purchase of one-third interests in the companies." Appellant's App. Vol. 2 at 26. That finding demonstrates that the parties intended for the payment Hagen and Brisco had received in 2016 to apply to the 2017 purchase. Yet, if that was the intent of the parties, it should have been reflected in the purchase agreement.

[43] Again, where, as here, an express contract controls, recovery cannot be had by Hagen and Brisco on a theory of unjust enrichment. *See Zoeller*, 904 N.E.2d at 221. Because the trial court was in error in reaching this conclusion, we reverse that component of the trial court's order.

## Conclusion

[44] The trial court did not err when it concluded that Harper had waived his statute-of-limitations defense under the CVRA or when it concluded that Harper had not been authorized to direct the transfer of funds. And, while the findings do not support a conclusion that the funds were special chattel such that Harper did not commit conversion, the findings support a conclusion that Harper committed theft. We therefore affirm the court's judgment in favor of the Plaintiffs on their claim under the CVRA, and we remand with instructions for the court to determine Plaintiffs' reasonable appellate attorney's fees. The trial court also did not err when it determined that Harper had breached his fiduciary duty. However, the court erred when it entered judgment in favor of

Hagen and Brisco on their claim for unjust enrichment, and we reverse that part of the court's order. We therefore affirm the court's judgment in part, reverse in part, and remand with instructions.

Affirmed in part, reversed in part, and remanded with instructions.

DeBoer, J., concurs.
Vaidik, J., concurs in part and concurs in result with separate opinion.

ATTORNEY FOR APPELLANT

Adam J. Sedia
Johnson & Bell, P.C.
Crown Point, Indiana

ATTORNEYS FOR APPELLEES

James M. Lewis
Elizabeth A. Klesmith
THK Law, LLP
South Bend, Indiana

**Vaidik, Judge, concurring in part and concurring in result.**

[46] I concur in full with the majority on the issues of breach of fiduciary duty and unjust enrichment. But I write separately to address the majority's holding on Plaintiffs' claim under the Crime Victims Relief Act (CVRA). The majority concludes that the judgment for Plaintiffs on their CVRA claim cannot be sustained on the ground that Harper committed conversion but that it can be affirmed on the ground that Harper committed theft. I respectfully disagree.

[47] In ruling for Plaintiffs on their CVRA claim, the trial court "conservatively characterize[d] Harper's action as a Criminal Conversion." Appellant's App. Vol. II p. 60. Criminal conversion is defined as "knowingly or intentionally exert[ing] unauthorized control over property of another person." Ind. Code § 35-43-4-3(a). Under the CVRA, a person who suffers a pecuniary loss as a result of certain property offenses, including conversion, may bring a civil action against the person who caused the loss. I.C. § 34-24-3-1. The CVRA "provides for recovery of up to three times actual damages, as well as costs and attorney fees, if a plaintiff proves the elements of criminal conversion by a preponderance of the evidence." *Bowden v. Agnew*, 2 N.E.3d 743, 750 (Ind. Ct. App. 2014). Here, Harper used K&K's real estate to secure a $275,000 loan. As shown in K&K's "Check/Deposit Register" below, the funds from the loan ($273,787 after transaction fees) were wired into K&K's account on January 19, 2017.

| K & K Real Estate Holdings LLC Check/Deposit Register 2017 | | Deposits | Withdrawals | Balance |
|---|---|---|---|---|
| Wire Transfer 1/19/17 | Proceeds RBS | $273,787.00 | | $273,787.00 |
| Check 101 - S & H Leasing, LLC | Loan | | $100,000.00 | $173,787.00 |
| Check 102-PNC Bank | Payoff LOC | | $173,787.00 | $0.00 |

Ex. Vol. VII p. 41. That same day, Harper wrote two checks from K&K's account: one for $100,000 to extinguish his personal debt to S&H, and one for $173,787 to his personal line of credit at PNC Bank.

Id. at 42.

[48] I agree with the majority that although Harper was the sole manager of the LLCs in 2017 and thereby had "full and complete power and authority to make all decisions and to take all actions incident to the management and conduct of

the [LLCs'] business and affairs," Appellant's App. Vol. III pp. 157, 189, his transfer of the $273,787 from K&K's account for his personal use was unauthorized. This satisfies the statutory elements of criminal conversion.

[49] But as the majority explains, in the context of conversion as the basis for a CVRA claim, this Court has held that "money may be the subject of an action for conversion only if it is capable of being identified as a special chattel." *Bowden*, 2 N.E.3d at 750. Money can be identified as a "special chattel" if it is "a determinate sum with which the defendant was entrusted to apply to a certain purpose." *Id.*; *Clark-Silberman v. Silberman*, 78 N.E.3d 708, 715 (Ind. Ct. App. 2017). This standard is necessary to limit when money can be the basis for a CVRA claim, as the CVRA was not intended to apply to merely any dispute over money but to those that would constitute crimes. *See Benaugh v. Garner*, 876 N.E.2d 344, 349 (Ind. Ct. App. 2007) ("[I]n enacting the Act, the legislature intended for it to serve as a deterrent to would-be criminals by increasing the financial risk and potential liability stemming from the commission of a property crime."), *trans. denied*; *see also Sapp v. Flagstar Bank, FSB*, 956 N.E.2d 660, 667 (Ind. Ct. App. 2011) ("[T]he statute does not apply to the mere failure to pay a debt."). In application, though, our Court has narrowed this standard to require that the allegedly converted money has been placed into a segregated account. *Compare Clark-Silberman*, 78 N.E.3d at 716-17 (finding conversion where money was "a determinate amount . . . placed in a separate and identified location for safekeeping" and, after being taken, wasn't "put into some other pool of money where it was co-mingled"), *and Midland-*

*Guardian Co. v. United Consumers Club, Inc.*, 499 N.E.2d 792 (Ind. Ct. App. 1986), *reh'g denied*, 502 N.E.2d 1354, 1355 (Ind. Ct. App. 1987) (finding conversion of money that was "entrusted to Midland to be separately held and accounted for" in a holdback reserve account), *with Kopis v. Savage*, 498 N.E.2d 1266, 1269-70 (Ind. Ct. App. 1986) (holding Kopis didn't convert $40,000 where parties didn't "set up an escrow account or … deliver the money to any third party for safekeeping" and instead "Kopis comingled the $40,000 with his own funds").

[50] Invoking this segregation requirement, the majority concludes that because Harper comingled the $273,787 with his own funds, it ceased to be separately identifiable chattel, and Plaintiffs no longer had a property interest in that specific $273,787. The majority cites *Kopis*, a case where the plaintiff voluntarily gave the defendant earnest money for a property sale, the defendant comingled the money with his own, and the plaintiff later demanded the money back but the defendant refused. We held that the defendant's refusal to return the earnest money did not amount to conversion because "[t]he parties did not agree to set up an escrow account or to deliver the money to any third party for safekeeping." *Kopis*, 498 N.E.2d at 1270; *see also Stevens v. Butler*, 639 N.E.2d 662, 667 (Ind. Ct. App. 1994) (holding that failure to refund earnest money constituted a refusal to pay a debt, not conversion, because money hadn't been placed in segregated account), *trans. denied*.

[51] Our Court has also applied the segregation requirement to cases that didn't involve earnest money. *See Clark-Silberman*, 78 N.E.3d at 717 (concluding wife

converted $46,182 that husband had put in safe deposit box where wife removed money and put it in her own safe deposit box); *Huff v. Biomet, Inc.*, 654 N.E.2d 830, 836 (Ind. Ct. App. 1995) (finding no conversion of money allegedly wrongfully withheld from employee's commissions where there was no evidence that employee "entrusted money to Biomet for a particular purpose" or "that Biomet retained specific funds which could be directly attributed" to employee), *abrogated on other grounds by St. Vincent Hosp. & Health Care Ctr., Inc. v. Steele*, 766 N.E.2d 699 (Ind. 2002). But our Supreme Court has not addressed whether segregation of funds is required in order for those funds to be the subject of a conversion action. I don't believe it should be.

[52] Undoubtedly, the segregation requirement was developed as an attempt to differentiate civil money cases from criminal cases. After all, if the case is determined to be criminal in nature, then the CVRA's harsh treble-damages penalty can be imposed. But segregation should not be required in conversion cases. Otherwise, the converter holds the power to determine whether a conversion has occurred. As the Illinois Appellate Court explained,

> [T]here is an element of unfairness in a rule that prohibits a conversion action for funds that are not segregated. Such a rule gives the alleged converter control over whether certain funds are subject to conversion because, depending on the type of account he chooses to place the funds, the funds may or may not be considered identifiable and, therefore, may or may not be subject to conversion.

*Roderick Dev. Inv. Co., Inc. v. Cmty. Bank of Edgewater*, 668 N.E.2d 1129, 1137 (Ill. App. Ct. 1996).

[53] Instead, I would agree with those jurisdictions recognizing that money need not be segregated to be sufficiently identifiable to serve as the basis for a conversion action. *See, e.g.*, *Kirschner v. Bennett*, 648 F.Supp.2d 525, 542 (S.D.N.Y. 2009) ("Funds may be 'specifically identifiable' despite the fact that they are not alleged to be held in a segregated account."); *Welco Elecs., Inc. v. Mora*, 166 Cal. Rptr. 3d 877, 888 (Cal. Ct. App. 2014) ("A plaintiff must specifically identify the amount of money converted, not that a specific, identifiable amount of money has been entrusted to the defendant. . . . There is no requirement that the money have been held in trust—only that it be misappropriated."), *reh'g denied*; *Roderick*, 668 N.E.2d at 1137 ("[M]oney may be identified not only by segregation but also by its source or description."). Here, K&K's financial records—the Check/Deposit Register and the checks Harper wrote—show the exact sum of money that Harper took from K&K's account and where he put it. To me, this evidence sufficiently identifies the $273,787 as a special chattel. Therefore, I agree with the trial court that Harper converted the $273,787.

[54] Despite finding that Harper did not commit conversion, the majority affirms the judgment for Plaintiffs on their CVRA claim based on a finding that Harper committed theft. While I concur in this result, I disagree with the conclusion that Harper's conduct constitutes theft but not conversion. "Theft" is defined as "knowingly or intentionally exert[ing] unauthorized control over property of another person, with intent to deprive the other person of any part of its value

or use." I.C. § 35-43-4-2(a). "Indiana appellate courts have consistently held that criminal conversion is an inherently lesser included offense of theft because conversion may be established by proof of less than all the material elements of theft." *Poling v. State*, 938 N.E.2d 1212, 1215 (Ind. Ct. App. 2010). If there is insufficient evidence to find that Harper committed a conversion, then he cannot be guilty of theft. *See Wojtowicz v. State*, 545 N.E.2d 562, 564 (Ind. 1989). Given the majority's conclusion that Harper's conduct did not amount to conversion, that same conduct cannot, then, be found to constitute theft. Therefore, I concur only in result as to this issue.